# ROSEN ✧ SABA, LLP

TODD M. LANDER (State Bar No. 173031)
tlander@rosensaba.com
MICHAEL J. PENG (State Bar No. 260852)
mpeng@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone:   (310) 285-1727
Facsimile:   (310) 285-1728

Attorneys for Plaintiff
THE COMEDY STORE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| THE COMEDY STORE, a California corporation,<br><br>       *Plaintiff,*<br><br>vs.<br><br>MOSS ADAMS, LLP, a limited liability partnership; and DOES 1 through 20, inclusive,<br><br>       *Defendants.* | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) Gross Negligence**<br>**(2) Negligent Misrepresentation**<br>**(3) Constructive Fraud**<br>**(4) Breach of Fiduciary Duty**<br>**(5) Violation of Bus. & Prof. Code § 17200**<br><br>**DEMAND FOR JURY TRIAL** |



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff THE COMMEDY STORE, a California Corporation, hereby alleges the following:

## **INTRODUCTION**

1.     This action arises because the defendants, MOSS ADAMS, LLP ("Moss Adams" or "Defendant") and DOES 1 through 20, inclusive, misrepresented to the Comedy Store (hereinafter "Plaintiff" or "the Store") its expertise and knowledge about a Federal COVID-related relief program – the Shuttered Venue Operator Grant ("SVOG") – and, having induced the Store into engaging Defendant to assist with the Store's SVOG application, Defendant failed to monitor the status of the program and its updated deadline to apply for grant funds, thereby causing the Store to miss its SVOG application deadline in August 2021, when the program closed.  As a direct consequence of Defendant's misrepresentations, gross negligence and misconduct, the Store has suffered at least $8.5 million in damages.  And those damages are particularly punishing because these tax free SVOG grant funds, which were designed to provide over $16 billion in emergency assistance for performing arts businesses shuttered by COVID-19 – such as the Store – were a critical element of the Store's efforts to recover from the economic hardship imposed by the COVID-19 pandemic.

2.     The Comedy Store is an important cultural institution in Los Angeles.  It has stood on Sunset Boulevard for some five decades and has, in that time, hosted countless comedic and entertainment luminaries.  It is considered the greatest stand-up comedy club in the world.  Richard Pryor, Robin Williams, David Letterman and Jay Leno are a few of the legendary comedians who started their careers at the Store.  Showtime aired a five-part documentary on the history of this beloved and cherished institution.  The Store, the very first pure stand-up comedy club, is among the most recognizable and beloved businesses in Southern California and considered the greatest comedy club in the world by many iconic comedians. And it was thriving in the years prior to the COVID pandemic, routinely operating at full or excess capacity – lines for entry were around the block as late as the weekend before the March 2020 COVID lockdown.  But it was



uniquely susceptible to the consequences of the pandemic – its physical characteristics, essentially a bar and club in a confined space, were such that it fell into a category of businesses that were among the last to re-open in the Los Angeles area.  It was, as a consequence, closed from March 13, 2020-April 30, 2021 (limited capacity) and it wasn't until late Fall 2021 was it able to enjoy full capacity as part of Los Angeles County's 2020 and 2021 Covid restrictions.  Those forced closures and restrictions on capacity imposed an immense financial toll on the business.

3.    As alleged below, however, the Store's Management labored to ensure that this iconic business keeps its doors open and did not succumb to the economic fallout of the pandemic. In doing so, it became aware of the SVOG program, one that afforded live entertainment venues, such as the Store, generous financial grants that, in the Store's case, would have provided desperately needed funds that could redress losses and debts accumulated during the long COVID ordeal.

4.    The Store realized, however, that it needed to engage an expert to shepherd it through the process.  Accordingly, it contacted Moss Adams about helping to navigate the SVOG application process.

5.    Moss Adams, for its part, not only publicly marketed itself as sophisticated advisor on SVOG issues, but Melissa Harman ("Harmon"), a partner at Moss Adams, introduced and specifically represented to the Store that Aparna Venkateswaran, who worked in Defendant's Orange County Office, was an "expert on all things SBA" and "[s]he could of course assist" the Store with whatever it needed.

6.    Based on its reasonable belief of these representations, the Store engaged Moss Adams in July 2021 for the express purpose of facilitating its SVOG application and ensuring, above all else, that it would receive the available funds for which it was eligible.

7.    To be sure, the Store's financial eligibility for the program was never in question – the Store easily met all the published operational and related requirements and, given that it experienced a nearly a 90%+ decline in gross revenue in quarters two through four of 2020 when compared to 2019, it likewise satisfied the financial criteria.  Defendant

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

COMPLAINT FOR DAMAGES



certainly agreed and, during the course of communications in July and August 2021, never suggested that the Store would have any difficulty securing a SVOG grant.

8.      What Defendant did not disclose, however, was that Venkateswaran was not an expert in all things SBA, and was ignorant of the fact that the entire SVOG program was set to close in late August 2021.  Compounding that ignorance, Moss Adams and Venkateswaran apparently took no steps to monitor or otherwise determine whether the program was subject to a limited duration, and instead allowed the Store to believe it had ample time to refine its application and submit only when the process was complete.

9.      The result was disastrous.  On August 26, 2021 – one day after the Store discussed the application with Venkateswaran – the Store attempted to submit its application, only to discover that the program had closed and eligibility consequently terminated.

10.     When the Store contacted Venkateswaran to inform her of the situation, the response was both chilling and telling – Venkateswaran was "surprised" that it had closed and surprised the SBA did not tell her.  Defendant, in other words, led the Store down the veritable garden path while failing to exercise the most basic skill and diligence attendant to the engagement it had taken, namely to understand and advise as to how long the SVOG program would remain open.

11.     The Store, as a direct result, has been denied access to no less than $ 8.5 million in tax-free grant funds.  And as if the circumstances could not be more egregious, Moss Adams later claimed – after the Store issued a demand letter concerning this gross negligence – that ***its entire file relating to the engagement has been lost***.

12.     Setting aside the incredulity of that claim, the basic fact is that Defendant and its agents, even after misrepresenting their capabilities and expertise, owed the Store a clear and unambiguous duty of care, and breached that duty through the negligence and ignorance discussed herein.

/ / /

/ / /

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



## JURISDICTION

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties to this civil action are citizens of different States, and the matter in controversy exceeds $75,000.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

15.     Plaintiff THE COMEDY STORE was, and now is, a corporation organized and existing under the laws of the State of California, and which maintains its principal place of business at 8433 Sunset Blvd., Los Angeles, California 90069.

16.     Plaintiff is informed and believes, and on that basis alleges, that defendant MOSS ADAMS, LLP was, and now is, a limited liability partnership organized and existing under the laws of the State of Washington, and maintains offices in Southern California, including within the Central District of California.

17.     The true names and capacities, whether individual, partner, associate, corporate or otherwise, of defendants DOES 1 through 20, inclusive, and each of them, are unknown to Plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and thereon alleges that each defendant designated herein as a "DOE" is legally responsible in some manner for the events and happenings herein mentioned. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of said DOES, appropriately charging allegations when they have been ascertained. Plaintiff is informed and believes that each of the DOE defendants was responsible in some manner for an illegal cause of the injuries and damages alleged herein, and/or for some or all of the defendants.

18.     Plaintiff is further informed and believes and thereon alleges that each defendant, both specifically named and named as a DOE, was an agent, alter ego, employee, servant and/or representative of each of the remaining defendants, and, in doing

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



or failing to do the things alleged herein, was acting within the course and scope of said agency, alter ego, employment, service, and/or representation.

19.     Plaintiff is further informed and believes and thereon allege that each of the defendants herein, whether named as DOES or otherwise, acted in concert, agreement and conspiracy with the other defendants for the common purpose of engaging in a scheme to defraud Plaintiff as alleged hereinbelow.

## FACTUAL BACKGROUND

### The Comedy Store and the Pandemic

20.     The Store was, as noted, uniquely vulnerable to the economic challenges the COVID pandemic posed – it is a comedy club whose success is premised on attracting as many people as possible into an intimate space, so those people will be induced into much needed robust laughter.   And while the Store had been enjoying both creative and economic success in the years preceding the arrival of COVID in early 2020, the basic culture of its business and the attraction of what it offers – comedians making many people laugh in a small room – are precisely the physical circumstances pandemic protocols were intended to prevent.[1]

21.     The restrictions imposed in Los Angeles County "worked," at least as it relates to the Store.  Mandated social distancing and proscriptions on indoor gatherings all but shuddered the company's operations in March 2020, and effectively ground its business to a halt.[2]  The resulting economic harm was stark and immediate.  The Store's contemporaneous profit and loss statements reflect the financial impact.  Its gross revenue for the first quarter of 2020 – a period inclusive of the last two weeks of March, during which operations had been suspended – plummeted by nearly 100%.  Robust quarter one profits in 2020 turned into a staggering quarter two ***loss of $1,702,577.71***.

/ / /

---

[1]  The Store's balance sheets and profit and loss statements for 2019 demonstrate the volume of business and success the business was enjoying in the months before Covid wrought havoc with its ability to operate.

[2]  As an illustration on just how vertiginous this change of condition proved, lines for the Comedy Store stretched around the block the weekend before California's statewide shutdown wad announced.

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



22.     The Store, like many businesses, did what it could to survive these extraordinary times.  Through the rest of 2020, management undertook vigorous efforts to emphasize online and digital content, producing fundraisers and, ultimately and briefly, conducting live shows outside to offset, at least partially, the implications of the shutdown.  But the fact remained that due to its status as an entertainment club operating a small physical space, the Store was among the last category of businesses that were free to re-open.  And when it did eventually resume operations with a semblance of normalcy, in the second quarter 2021, the debts and losses accumulated during the pandemic were and remain crippling.

23.     Enter the Small Business Administration's Shuttered Venue Operators Grants ("SVOG") program.  A critical component of the Store's effort to climb out of this long haul COVID-induced hardship was obtaining available government assistance, and SVOG, approved as part of the CARES Act, was custom made for entertainment businesses like the Store.  A review of the eligibility requirements reveals, for example, that the applicant must: (1) have been in business on February 29, 2020 and, at the time of the application, been open and or in operation; (2) demonstrate a reduction in gross revenue of at least 25% during at least one quarter of 2020, compared to 2019; (3) not have more than 10% of its 2019 income from Federal resources; (4) not operate in more than one country, more than 10 states and have more than 500 employees; (5) have as its principal business either hosting live events, comedy shows, etc. by performing artists where not less than 70% of the earned revenue is derived by ticket sales/cover charges and/or the sale of merchandize/food beverage (including alcohol), or selling tickets to live concerts or comedy shows by performing artists an average of not less than 60 days before the show date; (6) either not be a nonprofit and most performances require a ticket purchase and cover charge (or a non-profit where performances are produced and managed by paid employees) (7) pay performers based on percentage of sale, a guarantee or other mutually beneficial arrangement other than complimentary food and beverage; and (8) the venue used for performances must have sound mixing equipment, a public

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ◇ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

address system, a lighting rig and an individual who performs at least two of a specified set of roles such as sound engineer, booker and promotor.

24. These requirements, general though they were, could specifically have been describing the operations of the Store, and the losses suffered during the pandemic. The Store sustained, for example, year-over-year losses far in excess of the 25% decline in gross revenue the criteria required. And SVOG was particularly attractive because the financial assistance took the form of a ***tax-free grant***, not a loan, and thus did not need to be repaid and/or no conditions had to be met for forgiveness of the loan.[3]

25. Given that, Harold Breslow ("Breslow") – the Store's temporary acting Controller and at the direction of Peter Shore ("Shore"), the CEO – investigated the program and the Store's eligibility for its benefits. Breslow preliminarily concluded that the Store would be eligible for a grant of up to $8.5 million, based on the program's published criteria concerning the available quantum of assistance. But Shore and Breslow knew that navigating the program could be complicated and they quickly concluded that, given the scope of the relief and how essential it was to the Store's long term economic prospects, consulting with an outside expert to assist in the process was essential.

**The Moss Adams Introduction, and the Moss Adams Representations**

26. Moss Adams broadly held itself out as particularly skilled in guiding potential clients through the SVOG Program. By way of example, in its February 19, 2021 "Alert" published on its webpage, Moss Adams described the overall SVOG program to its clients, potential clients and the general public, and emphasized: "We're Here to Help."

27. Breslow was also professionally acquainted with Melissa Harman ("Harman"), a Moss Adams partner in Los Angeles. Breslow consequently emailed Harman on July 21, 2021, identified himself as the Store's acting controller, and then proceeded to get to the point: "I . . . am looking for someone who can assist with applying for the Shuttered Venue Operators Grant." He then prevailed on Harman to "let me know

---

[3] By way of contrast, the Store ultimately repaid a significant amount of the PPP Loan it received.



if there is someone that I can talk with about this." Harman wasted no time in response, emailing Breslow seven minutes later and immediately boasted that "[w]e now work with Geffen, Center Theater Group and LA Phil *and have helped all with their SVOG."* Having assured Breslow of the firm's bona fides on the subject, she then introduced Venkateswaran as having become "our expert in all things SBA. She has helped out clients with their applications/reviewing the applications. She could of course assist you your questions and concerns."

28.     Breslow, pleased to receive such a prompt response and particularly happy to hear that Moss Adams could assist, emailed Venkateswaran later the same evening and asked to arrange a time to "discuss the SVOG and how you may be able to help us." The two spoke the following afternoon – July 22 – and discussed the SVOG program generally and the specific criteria more particularly. Breslow, for his part, emphasized that the while he was a seasoned financial officer, his knowledge of this program was limited to the general research he had conducted and thus the Store needed Moss Adams' expertise and experience in shepherding the Store's application through the SBA's processes. Venkateswaran, like Harman before her, was not shy in response, re-assuring Breslow that Moss Adams was willing and able to assist and closing the conversation by offering to provide a checklist of required items for the application process and general information concerning the program itself.

29.     Breslow, who was poised leave for a vacation at the end of July, emailed a reminder to Venkateswaran early the next afternoon, asking if it "would be possible to get the checklist and the other information you referred to before the weekend." A short time later Venkateswaran responsively emailed the requested items, providing Breslow – and in turn Shore and the Store's leadership – confidence that Moss Adams was as advertised concerning SVOG and that it would do what it said. And Breslow's vacation schedule did not appear to be a problem. He informed Venkateswaran that he would be out of the office for the first two weeks of August but would return to work on August 16. Venkateswaran did not, in response, suggest any complication due to his absence or

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

mention any relevant upcoming deadlines related to the SVOG program or the Store's right and ability to put its hands on critically needed grant funds.

30.     If Venkateswaran had informed Breslow of the rapidly approaching termination of the program, Shore would either have handled the discussions with Venkateswaran himself or otherwise deputized another officer to ensure that the application was completed and submitted before the date of termination.  He did not, because Moss Adams never informed the Store that the program was on the verge of elimination.

31.     What Venkateswaran did do was send Breslow Moss Adams' standard engagement letters on July 27, 2021 – just a few days before Breslow's vacation was set to begin.  Those letters consisted of the Master Services Agreement ("MSA") and the Master Services Agreement Statement of Work ("SOW"), the latter of which included various additional and important representations:

32.     The SOW provides that Moss Adams will consult with the Store concerning "one or more Federal Government sponsored programs responding to the Covid-19 pandemic," including providing the Store with general information concerning these programs.

33.     The SOW additionally represents that Moss Adams will "assist" the Store in its application for the SVOG funds "under the standard established by the [Economic Aid to Hard-Hit Small Businesses, Non-profits, and Venues] Act and U.S. Small Business Administration regulations."

34.     The SOW additionally represents that Moss Adams will assist the Store in preparing "alternative business plan scenarios for operating" the Store's business based on information provided as to expenditures and employment levels.

35.     The SOW further recites that Moss Adams will assist the Store with the process of documenting its assessment of economic need as prescribed in the CARES Act, and will give advice relating to the Shuttered Venue application process, including

/ / /

ROSEN ◆ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**_discussions of new guidance, government delays in reopening and market conditions in_** the Store's industries.

36.     The MSA further purports to limit any damages caused by Moss Adams' negligence arising out of its agreement with the Store to the "fees paid or payable to Moss Adams," which, according to Moss Adams, totals a mere $275 for a phone conversation on August 25, 2021.  But aside from the patently unconscionable result the enforcement of these provisions would impose – a $275 recovery in the wake of gross negligence that denied the Store $8.5 million in tax-free grant funds – the fact remains that the provisions are unenforceable in this instance.  Indeed, California law is clear and unambiguous in prohibiting the application of contractual liability limitations of this nature where, as here, the damages are caused by Moss Adams' gross negligence, the public interest is involved, and Moss Adams' misconduct is either fraudulent or willful.  The facts alleged in this Complaint, and which the Store will prove at trial, identify and establish that this "get out of jail free" card in the MSA has no place in this litigation.

37.     The MSA, though declared the governing document concerning the Moss Adams/Store relationship, contains little more than standard and boilerplate provisions.  The SOW, though more concise, includes the only terms that at least generally describe what Moss Adams claimed to be doing.  But neither agreement captures the full scope of what Breslow initially requested on July 21 and what Harman and Venkateswaran expressly promised to provide – working closely with the Store to ensure its application was timely and completely submitted.

38.     For all its banal generality, the SOW's representation concerning "new guidance," "under the standard established by the Act and [SBA] regulations," and "government delays in reopening" bespeaks the specific issue that ultimately sabotaged the Store SVOG application – namely, a change in circumstances regarding the program itself, in this case its termination.  In other words, Moss Adams directly induced Breslow and the Store to rely on its expertise in preparing and filing its application, and that

/ / /

COMPLAINT FOR DAMAGES

ROSEN ◇ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



obviously included assuring the application was filed while the program remained open and the grant remained available.

39.     What is now clear and alleged herein, however, is that Venkateswaran was no expert "in all things SBA," but was instead ignorant of the pending termination of the program and either indifferent to the Store's need for this grant or distracted by other issues as the process stumbled to its prejudicial conclusion.  That is apparent not simply because she made no mention of the program's duration when Breslow told her of his imminent vacation in late July, but additionally because she did not alert him to any risks when he emailed her on August 16 and announced he had returned to the office and was working on the application.

**Moss Adams Purports to Assist with the Store's Grant Application, Apparently Without Knowing the Program Was Concluding**

40.     Breslow and Venkateswaran had, as noted, a brief email exchange on August 16, 2021, and Breslow followed that by requesting on August 23 that the two "discuss our filing" on Wednesday, August 25.

41.     Breslow and Venkateswaran therefore scheduled a call for 8:30 a.m. on August 25th, and, in advance of the call and at Venkateswaran's request, Breslow emailed Venkateswaran a large package of documents necessary for the application.  That included the Store's 2019 and 2020 balance sheets and profit and loss statements, and the entire lineup of performers and sales for February 2020 – the month before pandemic restrictions were imposed.   These were, as Breslow understood it and as he explained to Venkateswaran in an email on August 25 at 7:28 a.m., "most of the documents required for the grant for your reference.  Talk to you soon."

42.     They did talk, later on the morning of August 25, and Breslow attempted to go through the documents and what was necessary to ensure the successful submission of the application.  He took notes during the call, and realized that certain additional information was needed for the application file and thus decided he would provide that

///



information on August 26 and speak with Venkateswaran on August 27 to review the updated application in anticipation of submitting the application with finality thereafter.

43.     Breslow had created an application file online with the SBA – something about which he informed Venkateswaran – but had yet to submit the application on August 25.  That was the point of the discussions with Venkateswaran and the assistance Moss Adams represented it would provide, namely, to ensure that the application itself was complete, contained the appropriate information that matched the requested grant, and ***was timely filed.***

44.      But when Breslow went online the next day, August 26, to update the information on the application, he was shocked to discover the application was no longer available and the site was shut down.  He promptly called Venkateswaran, who confessed that she was unaware of this change in circumstances and was "surprised" that she was not notified by the SBA.

45.     Thus, Venkateswaran's "surprise" constituted the principle response of Moss Adams to the news that its client was no longer eligible for a grant that could have single handedly provided the financial assistance needed to help the Store climb out of the COVID hole in which it found itself – ignorance of precisely the thing about which the Store retained it to be aware, and "surprise" that the SBA didn't tell it precisely the thing which the Store engaged it ensure it knew and understood.  And this, after the public advertising and ensuing protestations to Breslow about the firm's expertise – it didn't even know when the SVOG program was going to close.  The Store engaged Moss Adams, and Moss Adams induced the Store to engage it, to avoid exactly what happened.  And Moss Adams' responses was a metaphorical shrug of the shoulders.

46.     The Store formally severed its relationship with Moss Adams on September 8, 2021, and the losses incurred due to the firm's negligence and bungling of this process are immense.  And those losses are compounded because the grant funds were central to its Covid recovery model.

/ / /



47.    If the Store had been aware of the pending termination of the program, it would have done anything and everything necessary to ensure that its application was completed before the expiration date.

48.    That said, the total grant eligibility available to the Store, and which it was denied, is $8,506,252 – including both the initial grant and the preliminary grant to which the Store was also entitled because its quarter-one revenue in 2021 was 70% or more less than the same quarter in 2019.  These are simple, hard losses, and they constitute the amount of demand being made presently.

## The Store Makes a Demand and Moss Adams Responds It Has Lost the Store's Client File

49.    The Store unsurprisingly sent a demand letter to Moss Adams in 2021, informing it of the losses associated with the grant.  The letter went on to inform Moss Adams – as the retained advisors who failed to inform the Store of the most basic and fundamental element of the SVOG program – that the Store was terminating its engagement with Moss Adams.  And while the parties opened negotiations concerning this potential mediation and a pre-mediation exchange of documents, Moss Adams' counsel disclosed that its *client claims to have lost its entire file and presently maintains no record of it.*  That is, to say the least, a shocking and additional admission.  A prominent CPA firm, claiming expertise in the CARES Act and related government assistance and in the wake of allowing the Store's SVOG application to be delayed beyond the point of eligibility because it was not aware of the program's pending termination, now contends it has *no file of the engagement whatever.*  Thus, in this age of digital and paperless file keeping, we are asked to believe that this file somehow disappeared without a trace – no stored emails, no meeting reminders, no record of the information, not even copies of the executed MSA and SOW.  That contention is patently absurd on its face – the only way Moss Adams' file disappeared is because it was deliberately deleted.  There is no other conceivable explanation that passes even of modicum of basic scrutiny.

/ / /



50.     The disappearing/deleted file saga is not merely an exercise in rhetorical indigence by the Store.  It reflects, more practically, just how far below the standard of care Moss Adams' engagement fell in this case – having induced the Store to retain it on the promise of expertise in these grants only to sabotage the Store's application through confounding ignorance and indifference, Moss Adams is now hampering the Store's ability to understand the firm was doing, or not doing, while the process unfolded in 2021. The Store is now apparently denied the ability to discover any internal analysis Venkateswaran or others performed, whether they conducted any analysis, and indeed whether they breached any internal Moss Adams policies and procedures.  Those answers are now, if Moss Adams is to be believed, lost to history.  What remains, however, is a damning record of negligence and arrogance, concluded with what can only be described as a highly suspicious lost file.

## FIRST CAUSE OF ACTION
### GROSS NEGLIGENCE
### (Against All Defendants)

51.     Plaintiff repeats and re-alleges each of the paragraphs set forth above as though the same were set forth herein.

52.     Feeling the full brunt of the COVID-19 restrictions in the first half of 2019 and seeing its revenues plummet, the Store sought out someone with relevant expertise who could help shepherd it through the SBA's application process for the SVOG program in order to obtain the critically needed grant funds.

53.     On or about July 21, 2021, the Store spoke with Harman, who represented that Moss Adams had helped several other well-known entertainment venues with their SVOG applications, and she introduced the Store to Venkateswaran – who Harman described as Moss Adams' "expert in all things SBA."

54.     On or about July 22, 2021, the Store spoke with Venkateswaran and received re-assurances from her that she would be able to help the Store through the process and, in response to the Store's request for a checklist of items needed to submit the application and

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



inquiry regarding any pressing time constraints, Venkateswaran provided the checklist and made no mention of any timing issues.

55.    The Store and Moss Adams executed agreements dated July 27, 2021, wherein the Store retained Moss Adams for consulting services regarding "one or more Federal Government sponsored programs responding to the COVID-10 pandemic," to "assist" the store in its application for the SVOG funds "under the standard established by the [Economic Aid to Hard-Hit Small Businesses, Non-profits, and Venues] Act and U.S. Small Business Administration regulations," and to assist the Store in preparing "alternative business plan scenarios for operating" the Store's business based on information provided as to expenditures and employment levels.

56.    At all times mentioned in this Complaint, Moss Adams – including Harmon and Venkateswaran – failed to exercise reasonable care and skill in undertaking to perform such services for the Store and were negligent, in that they, among other things: (1) negligently referred the Store to Venkateswaran – who Harman described as Moss Adams' "expert in all things SBA" – which was not true; (2) failed to timely advise the store of the most critical deadline for which it was retained – to help submit their application materials to the SBA for SVOG funding, and (3) purportedly failed to properly store and retain the Store's entire file, resulting a complete loss of the file.  As a result of said failures on the part of Moss Adams, among other things, the Store missed out on funds available under the SVOG program.

57.    Moss Adams failed to act as a reasonably careful agent would have acted under the same or similar circumstances.  Namely, Moss Adams was not diligent and cautious in recommending help for the Store and did not keep abreast of the most important deadline associated with the very federal funding program on which they were retained.

58.    Moss Adams further failed to act as a reasonably careful agent would have acted under the same or similar circumstances when it failed to safeguard the Store's entire client file and lost it.

/ / /



59.     Moss Adams owed the Store a duty to use due care to consult, advise, and guide the Store in the matters on which it was consulted, and also to keep and safeguard the Store's information and files.

60.     Beyond the mere failure to exercise reasonable care, Moss Adams and its agents' conduct was so brazen and egregious as to be grossly negligent.  Indeed, each of their failures described above constitutes an **extreme departure** from what a reasonably careful person or agent would do in the same situation to prevent the type of harm that the Store suffered.

61.     Moreover, the issues involved here constitute a matter of public interest, because: (1) the SVOG program was specifically articulated as a means of mitigating the losses associated with the Covid-19 pandemic – namely, a public health crisis – and thus amounted to public policy response by the Government; and (2) Moss Adams and its agents misleadingly advertised and represented itself and specifically Venkateswaran as "experts" in handling SBA-related issues, including SVOG matters, and therefore specifically implicated these public policy matters in their misconduct.

62.     Cal. Code Regs., tit. 16, §§ 63, 68, 68.1, and Cal. Bus. & Prof. Code § 17500 specifically forbid, among other things, accounts in California from making false or misleading statements in advertising and retaining client files after a demand for their return has been made.

63.     As a direct and proximate result of Moss Adams' grossly negligent conduct described above, Plaintiff has sustained substantial damages in an amount to be proven at trial, but in no case less than the compensation necessary to place the Store in the position it would have realized had it received the $8.5 million in tax-free grant funds to which it was entitled.  That total compensation will be proven at trial, but is not less than $12 million.

/ / /

/ / /

/ / /

/ / /

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**SECOND CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against All Defendants)**

64.     Plaintiff repeats and re-alleges each of the paragraphs set forth above as though the same were set forth herein.

65.     In July 2021, Moss Adams, through Harman, represented and assured the Store that Venkateswaran was Moss Adams' "expert in all things SBA," such that it could assist Plaintiff with its application for the grant.

66.     On or about July 22, 2021, the Store spoke with Venkateswaran and received re-assurances from her that she would be able to help the Store through the process and, in response to the Store's request for a checklist of items needed to submit the application and inquiry regarding any pressing time constraints, Venkateswaran provided the checklist and made no mention of any timing issues.

67.     At the time Moss Adams, Harmon, and Venkateswaran made these representations to the Store, they had no reasonable grounds for believing these representations were true, but made them anyway with the intent of inducing the Store to place its trust and confidence in Moss Adams and them for their own monetary and professional gain.

68.     At the time Moss Adams, Harmon, and Venkateswaran made these representations, the Store and its controller, Breslow, were ignorant of the true facts, which were that Moss Adams, Harmon, and Venkateswaran were not experts when it came to applying for SVOG funds, Moss Adams and Venkateswaran had inadequate controls in place to keep abreast of the program, and that there was indeed an impending deadline that was either known or foreseeable with regard to its SVOG application.

69.     The Store and Breslow reasonably and justifiably relied on Moss Adams' representations.

/ / /

/ / /

COMPLAINT FOR DAMAGES

70.     As a direct and proximate result of Moss Adams' misrepresentations, Plaintiff has sustained substantial damages in an amount to be proven at trial, but in no case less than $12 million.

**THIRD CAUSE OF ACTION**
**CONSTRUCTIVE FRAUD**
**(Against All Defendants)**

71.     Plaintiff repeats and re-alleges each of the paragraphs set forth above as though the same were set forth herein.

72.     In July 2021, in response to an inquiry from Plaintiff asking for Moss Adams, through its employee Harmon, represented that Moss Adams – and particularly Venkateswaran – had helped other shuttered entertainment venues local to the Los Angeles Area with their SVOG applications, and that Venkateswaran had become Moss Adams' "expert in all things SBA" and that she would be able to assist the Store through its application process.

73.     On or about July 22, 2021, the Store spoke with Venkateswaran and received re-assurances from her that she would be able to help the Store through the process and, in response to the Store's request for a checklist of items needed to submit the application and inquiry regarding any pressing time constraints, Venkateswaran provided the checklist and made no mention of any timing issues.

74.     In the SOW, dated July 27, 2021, Moss Adams further represented, among other things, that it would:  (1) consult with the Store concerning "one or more Federal Government sponsored programs responding to the Covid-19 pandemic, including providing the Store with general information concerning these programs; (2) "assist" the Store in its application for the SVOG funds "under the standard established by the [Economic Aid to Hard-Hit Small Businesses, Non-profits, and Venues] Act and U.S. Small Business Administration regulations; (3) assist the Store in preparing "alternative business plan scenarios for operating" the Store's business based on information provided as to expenditures and employment levels; and (4) assist the Store with the process of

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

documenting its assessment of economic need as prescribed in the Cares Act, and will give advice relating to the Shuttered Venue application process, including "discussions of new guidance, government delays in reopening and market conditions in" the Store's industries.

75.     Based on these representations, the Store retained Moss Adams for its purported expertise and competence to carry out the tasks for which it was retained – namely, to help assist, advise, and guide the Store through the SVOG application process.

76.     At all times relevant herein, Moss Adams owed the store a fiduciary duty, derived from the fact that it was retained as a consultant to provide its expertise, assistance, advice, and guidance regarding the SVOG applications process.

77.     Moss Adams misled Plaintiff by misrepresenting or failing to disclose that it and Venkateswaran were, in fact, not experts on the SVOG application process, they actually had incomplete information with respect to the application process, and they had no systems in place by which they would stay abreast of the program's important updates and deadlines.

78.     Moss Adams knew, or should have known, that it was not experts nor had special skills or systems in place necessary to navigate the SVOG application process.

79.     At the time Moss Adams made the above-stated representations, it knew or had reason to know that the representations were false and misleading.

80.     The Store believed and relied upon Moss Adams' representations to its detriment.  Breslow specifically asked Venkateswaran about the timing of gathering the required information necessary to complete and submit its application, and she never suggested to the Store that there was or could be an imminent deadline.

81.     As a direct and proximate result of Moss Adams' misrepresentations, the Store has sustained substantial damages in an amount to be proven at trial, but in no case less than $12 million.

/ / /

/ / /

/ / /



### FOURTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

82.     Plaintiff repeats and re-alleges each of the paragraphs set forth above as though the same were set forth herein.

83.     As experienced CPAs, consultants, advisors, and purported experts in "all things SBA," Moss Adams, Harmon, and Venkateswaran owed fiduciary duties of due care and to act in good faith to the Store.  Their fiduciary duties included obligations to discharge their services in good faith, act prudently in handling of services for which the Store sought assistance, to put the interests of the Store before their own, and to safeguard the Store's file.

84.     Moss Adams, and particularly Harman, breached their duties of good faith and care when they, among other things, put their own financial and professional interests ahead of the Store's interests when they referred the store to Venkateswaran as a so-called expert who could competently help advise and guide the Store through the SVOG application process.

85.     Moss Adams, and particularly Venkateswaran, breached their duty of care when they, among other things, did not keep abreast of the deadline by which the Store had to apply for SVOG funding – the sole purpose for which the Store sought out and retained Moss Adams' services.

86.     Moss Adams, and particularly Venkateswaran, breached their duties of care by, among other things, violated a host of rules and regulations, including the California Board of Accountancy regulations and California Business and Professions Code, when Moss Adams happened to "lose" the Store's entire file, sometime soon after realizing that they blew the deadline for the Store's SVOG application.

87.     As a direct and proximate result of Moss Adams' breach of fiduciary duties, Plaintiff has sustained substantial damages in an amount to be proven at trial, but in no case less than $12 million.



## FIFTH CAUSE OF ACTION
### UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200
**(Against Moss Adams)**

88.     Plaintiff repeats and re-alleges each of the paragraphs set forth above as though the same were set forth herein.

89.     Moss Adams' conduct, as alleged above, constitutes unlawful, unfair and/or fraudulent business practices, as defined in the California Business and Professions Code §17200 et seq. California Business and Professions Code §§17200 et seq. borrows violations from other statutes and laws and makes them unlawful to engage in as a business practice.  Plaintiff's California Business and Professions Code § 17200 allegation are tethered to at least the following:

90.     Moss Adams' inducement of detrimental reliance through negligent misrepresentation and constructive fraud constitutes unfair competition under California Business and Professions Code §§ 17200 et seq.

91.     Moss Adams' violations of Cal. Code Regs., tit. 16, §§ 63, 68, 68.1, and Cal. Bus. & Prof. Code § 17500. of breach of contract constitutes unfair competition under California Business and Professions Code §§ 17200 et seq.

92.     As a direct and proximate result of Moss Adams' wrongful acts, as set forth above, Plaintiff has suffered various injuries according to proof at trial.

93.     Plaintiff is entitled to actual damages including, but not limited to, loss of funds from failure the timely submit the SVOG application.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendant MOSS ADAMS, LLP, and DOES 1-20, and each of them, as set forth below:

1.     For special damages in an amount according to proof, but not less than $12,000,000;

2.     For general damages according to proof;

3.     For an award of punitive damages in an amount to be determined;



4.      For reasonable attorneys' fees;

5.      For all costs of suit incurred herein;

6.      Pre-judgment interest according to proof; and

7.      For such other and further relief as this Court deems as just and proper.

### **JURY TRIAL DEMAND**

Plaintiff hereby respectfully demands a jury trial on all claims for which a jury is available under the law.

DATED:  July 26, 2022                                    ROSEN ✧ SABA, LLP

By:      _____/s/Michael J. Peng_____

TODD M. LANDER
MICHAEL J. PENG
Attorneys for Plaintiff
THE COMEDY STORE

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

